And we will proceed to the second case of the day, which is INRAE Testosterone Replacement Therapy Products Liability Litigation, Appeal Number 17-2056. Ms. Bierstein, take your time. No problem. I'd make two trips if I were you. That's what I'm going to need. Good morning. Good morning. I apologize for the delays, Your Honor. May it please the Court, I'm Andrea Bierstein. I represent the plaintiff appellants in this appeal. Plaintiffs are more than 1,000 individuals who were injured by Pfizer's product epitestosterone. And as the Court is aware, this is an appeal from the dismissal in a multidistrict litigation of plaintiffs' claims at the pleading stage on the ground of preemption because the district court found that it was impossible for Pfizer unilaterally to add warnings about cardiovascular risks to the depotee label without running afoul of federal law or regulations. Because the review in this Court on this issue is de novo, I'm going to focus on Pfizer's arguments rather than on the district court opinion. The fundamental flaw in Pfizer's argument is its inability to identify a single statute or regulation that would have precluded the label change at issue. Pfizer cites multiple sections of the U.S. Code and the Code of Federal Regulation that require the label of a generic drug to be identical to the label of the reference-listed drug. And as we know, in this case, depotee is the reference-listed drug. Pfizer argues that these sections require the label to be identical not merely to the label of the RLD, but to the approved label of the RLD. The problem is that's not so. And the reason it's not so is that only one of the statutes or regulations that Pfizer cites, and indeed only one of the statutes or regulations cited by the Supreme Court in the Mensing decision, has any applicability to changes that are made to a label after a drug is approved. All the other ones pertain only to the label that has to be submitted with the application. The section that does apply to changes made after the label is approved doesn't say that it has to be identical to the approved RLD label. That word approved that Pfizer relies on does not appear in that section. Let me step back and go through which sections we're talking about. Pfizer cites and relies on five sections, which are the sections cited in Mensing, in support of the holding that generic manufacturers are precluded from unilaterally adding warnings to their labels. Those five sections are two subsections of 21 U.S.C. 355. One is J2A5. The other is J4G. And three sections of the Code of Federal Regulations, 21 CFR 314.94, 314.127, and 314.150. All of these are cited in our brief and in the Pfizer brief. The first four of those pertain exclusively to the application process. So 355 talks about what the abbreviated drug application must contain. It talks about the conditions for approval of the ANDA. 314.94 is about content and format of the ANDA, so it's how you make the application. 314.127 is grounds for refusal. So all of those do say that you have to submit a label identical to the approved label of the RLD. But they don't have anything to do with what happens after the drug is approved. And I should note that the Mensing decision specifically recognized this distinction between the regulations that govern the application process and the ones that govern the label after the drug is approved. So if you look in Mensing at 564 U.S. 613, the court goes through all the differences in the application process, and then they say none of this is in dispute, everyone agrees on it. And then, this is the quote at 613, what is in dispute is whether and to what extent generic manufacturers may change their labels after initial FDA approval. So that was the question there. That's the same question here. Now, in Mensing, the court, in finding that the true generics that are not RLDs could not make those changes, Mensing cites two things. In the sentence I quoted on 613, they quote the FDA comments in the Federal Register in 1992. And those comments were as follows. Somebody commenting on these new regulations that were about to come in, the regulations that we're talking about, one of the comments was, wouldn't it be good if ANDA holders could make changes to the label unilaterally after approval? And the FDA said, we think it's really important to have uniformity, that the label for the generics has to be the same as the label for the brand name, or doctors will get confused about whether they're the same. So the FDA's comment was, we need all the labels to be the same. And that's what the Supreme Court was citing in Mensing where you would have had a divergence, where you had a true generic and you also had a brand name. The Supreme Court in Mensing also cited at page 615 the other regulation, the one that's at issue here, which is 314.150. That is the only regulation cited by Mensing or by Pfizer that limits the ability of a generic manufacturer to make changes after approval. Remember, the 1992 comment in the Federal Register is FDA comment. The actual regulation that implements this is 314.150. And that's the one that limits the ability of a generic manufacturer to make changes if those changes would cause the label to diverge from that of the RLD. And that's the provision that says if your label isn't the same, the FDA can yank your approval. So if you don't keep your label the same, the FDA can take away your right to market the drug. So is uniformity the only goal of this regulation? Your Honor, I believe it is the only goal. But I wanted to finish with 150 because what's really important is what it doesn't say. Because what 150 says is that they can take away your approval if they find that the labeling for the drug product that is the subject of the abbreviated new drug application is no longer consistent with that for the listed drug referred to in the abbreviated new drug application. That approved label business that we hear so much about in the brief, that the RLD has to be identical to the approved RLD, that's not here. What this regulation says is you lose your ability to market your drug if your label is no longer consistent with that for the listed drug. It is not possible for Depo-T's label to be inconsistent with that for the listed drug because Depo-T is the listed drug. So under 314.150, it is not possible for Pfizer to lose the right to sell Depo-T by making a unilateral change to the label because its label will always be consistent with that for the listed drug. And those are the only words that appear in that regulation. There are some issues about differences that are allowed for patents, but in terms of this, it doesn't say approved. And yes, Your Honor, I think uniformity, as between generics and brand-name drugs, every time the FDA has spoken about this, what they've been concerned about is maintaining uniformity between them. And I think it's important to remember that one of the purposes of Hatch-Waxman was to make generic drugs more widely available, to make generic drugs more available to consumers. And so it was important to the FDA, and this is what you'll see in the 1992 comments, that doctors have the assurance that these products were really the same. And so they wanted the label to be the same. But this is the only regulation that implements that, that the label should be the same. Now, other than that, the RLD holder is subject to the same requirements as anybody else. Now, all of the drug manufacturers are limited in their ability to make unilateral changes to their label. And they're all limited by 314.70, which we've referred to as the CBE regulation, but it's actually much more. It's the regulation that governs how do you make unilateral changes after approval. Isn't that only available to NDAs? Well, that's the interesting point. So to the extent that there's some ambiguity about who it's available to, there's another section that we have to look at, and that's 314.97, which is explicitly applicable to NDA applicants. So 314.97 is the regulation that talks about how does an NDA applicant make unilateral changes. What does it say? It says the NDA applicant, quote, shall comply with the requirements of 314.70. So regardless of how we construe 314.70, I'm in my rebuttal time, so let me just finish my sentence. How do you escape the PLVA ruling, though, that says that NDAs cannot unilaterally make changes? I'm sorry, which ruling? The PLVA case. Well, because in that case, it was a ‑‑ I guess we call it NEMC. Sorry. No, that's okay. That's okay, Your Honor. We'll just call it the Supreme Court. Because almost all NDAs are generics that are a different drug from the brand name, and mencing is concerned about the problem of an identical label. In mencing, the plaintiff was arguing that the generic should have made a change that would have put the label at odds with the brand name. And so the duty of being identical would have been violated because they were two different drugs. We have an unusual situation, which almost never comes up, where the ANDA drug is the reference listed drug. That was not the case in mencing. That's why mencing comes out the other way, because for most ANDA holders there's a separate drug, the NDA, that's the RLD. Ms. Berstein, before you sit down, I need to ask you, I don't want to call jurisdiction housekeeping, but apparently in this group of cases we've got a number of cases that lack complete diversity. Is that right? Yes. What do you think we should do about that? Well, our original proposal was that this court should dismiss those appeals, and I understand that Pfizer's proposal was that the court should dismiss those cases in their entirety. I think this court can do that, but I think if the court were to dismiss the appeal, the district court could handle whether they wanted to drop a defendant or whether there was a way to preserve jurisdiction, but I think certainly those appeals need to be dismissed. Well, in all of them there's a final judgment now, right? Dismissing on the merits. That's correct. And it would seem to me that the appropriate disposition would be to set aside those judgments and modify them to make them dismissal for lack of jurisdiction, or are there some that we're supposed to order just dismissal of certain defendants? I don't think that, Your Honor, that this court is in a position to order dismissal. Well, there are two types of cases in this instance. There are ones where there's final judgment and there are ones where there's partial final judgment, the Rule 54B final judgment. And on the ones where there's a final judgment in terms of vacating the judgment on the merits and making it a judgment for lack of jurisdiction, that might make sense. The Rule 54B partial final judgments, it might be more appropriate to leave that to the district court to deal with the jurisdictional issues that are raised in those cases. But we would need to set aside the 54B for lack of jurisdiction on the merits. I think that would be correct, Your Honor. Okay. I hope defendants will tell us their thoughts on that as well. Thank you. For the defense. Thank you, Judge Hamilton. Canon Shanmugam of Williams and Connolly for the appellees. May it please the court. The question presented in this appeal is a simple one. Whether appellees, the manufacturers of an antidrug, are entitled under federal law unilaterally to change the labeling for their drug simply because the drug has been designated as a reference listed drug. The answer to that question is no. FDA's regulations require antiholders to maintain the labeling previously approved by FDA, and FDA has consistently interpreted those regulations to preclude unilateral changes. And all of the federal courts to have considered the issue, including the Fifth Circuit and the Sixth Circuit, have rejected the argument that an antidrug's designation as a reference listed drug somehow alters the analysis. The district court carefully considered appellants' arguments, and it concluded that because federal law precluded appellees from making unilateral changes to the labeling for their drug, it preempted state law claims based on the sufficiency of that labeling. So what's the clearest prohibition? Sure. So, Judge Hamilton, let me explain how we think the regulations work, and then I want to address Ms. Bierstein's argument, which is really a new argument today about the sameness regulations. In our view, the operation of the regulations here is relatively straightforward. As Ms. Bierstein acknowledged, what FDA has done, and it did this to some extent in PLEVA versus mensing, is to reconcile the CBE regulations with the sameness regulations. The CBE regulations are Section 314.70 and 314.97. Now, we acknowledge that there's some skirmishing about the exact meaning of 314.70, that at a minimum, 314.97 allows ANDA manufacturers to invoke the CBE process. The question is, what can ANDA manufacturers actually do in the CBE process? And what the FDA has said, and it said this to the Supreme Court in PLEVA versus mensing, is that ANDA manufacturers are limited in what they can do. They can use the CBE process to conform their labels to the labels for an NDA drug. They can use the CBE process to respond to changes mandated by FDA. But what they can't do is make unilateral changes. And, of course, in PLEVA versus mensing, the Supreme Court relied on that interpretation in concluding that the ANDA manufacturers at issue were not entitled to make unilateral changes and, therefore, that claims against them were preempted. And in our view, that reasoning controls here. And, indeed, if you take a look at the Supreme Court's opinions in PLEVA versus mensing, the Supreme Court acknowledged that there might be a situation in which there is no one who is able to invoke the CBE process. If you take a look at Justice Sotomayor's dissenting opinion, she at two points in the opinion points out that one of the consequences of the majority's ruling is that there might be a circumstance in which the NDA manufacturer has left the market, and, therefore, no one will be able to invoke the CBE process, at least to make unilateral changes. So all of that is a bridge that the Supreme Court has already crossed. The sole remaining question is whether there is some basis for attempting to carve out ANDA drugs that are reference-listed drugs, or, indeed, carving out even a narrower category of pre-Hatch-Waxman ANDA drugs. And in response to that, I think our fundamental submission is that FDA itself has made clear that consistent with its interpretation that no ANDA manufacturers can make unilateral changes, that that principle of interpretation applies with equal force to ANDA manufacturers whose drugs are reference-listed. And I would point the Court to the proposed rule in 2013 at 78 Federal Register 67-989, and also to the regulatory impact analysis that is in our appendix at page 10, where FDA acknowledges the specific category of ANDA drugs that are reference-listed drugs and says that the same rule applies in that circumstance. And so, at a minimum, even if you thought the regulations were ambiguous, FDA has interpreted its regulations to apply to reference-listed ANDA drugs and non-reference-listed ANDA drugs alike. And that interpretation should be entitled to deference. Now let me address the argument that Ms. Bierstein made today, because I think it is a somewhat different argument from the argument that is made in the briefs. Before you do that, could you help us straighten, make sure we don't fumble the jurisdictional problems that are posed here? Sure. So, as you pointed out, Judge Hamilton, and as is acknowledged in the briefs, there are some of these cases in which there is a diversity problem. And our submission, relying on authority both from the Supreme Court and from this Court, is that this Court has the authority under these circumstances to dismiss those non-diverse defendants from the underlying cases and not just from the appeals. And Ms. Bierstein, at least in her reply brief, acknowledges that that is an appropriate solution, I believe, on the last page of her reply brief. And so, you know, the Court, I think, could technically vacate the judgments in those cases and remand with instructions to dismiss the non-diverse defendants from those cases for lack of jurisdiction. But, obviously, we would ultimately be asking— How does this deal with the problems we've got of some individual cases where final judgments have been entered and others where there are a number of other defendants and it's only a 54B judgment that we're dealing with? So, I think that this Court could do that with regard to those judgments as well. In other words, with regard to the— I mean, I suppose that with regard to the 54B judgments, if the non-diverse defendants are still in the underlying cases, you know, I don't know that there's really anything to be done other than to affirm the 54B judgments as to my clients. This Court could, I suppose, indicate— If the district court didn't have jurisdiction in the first place? I mean, it's a little bit—it's sort of an odd situation because the district court would not have jurisdiction by virtue of the non-diverse defendants who are still in the underlying case. Right. I suppose that in that circumstance— I hate to get technical, but it is jurisdiction. No, it's important because it is the last line of your opinion. I think that you would probably vacate in that circumstance as well and indicate that there are non-diverse defendants and therefore the district court never had jurisdiction because, as you say, that goes to the underlying jurisdiction of the district court to hear those cases. Now, I do want to get to Ms. Bierstein's submission today because, again, I think it's a somewhat different submission from the submission that was in Appellant's opening and reply briefs. Today she really focuses on the fact that, in her view, the regulations that apply to the duty of sameness are regulations that, in the main, focus on the initial approval process. And I think it is certainly true that some of those regulations speak primarily to approval. Now, of course, these are the very same regulations, as Ms. Bierstein acknowledges, that were at issue in the Supreme Court in Pleve versus Mensing, and yet the Supreme Court, relying on FDA's interpretation of those regulations, concluded that even when you get past the point of approval and the manufacturers more generally do not have the ability to make unilateral changes. So this is another respect in which I think Appellant's argument really flies in the face of what the Supreme Court did in Mensing. But I think more generally, again, the FDA has properly interpreted its regulations to apply at every stage of proceedings, whether it's at initial approval or at a later point. To put it again somewhat differently, an ANDA manufacturer has a constant obligation of sameness. That obligation does not exist simply at the outset. That exists as long as the ANDA manufacturer's drug is on the market. And not to get too technical about this, but one of the regulations that Ms. Bierstein pointed to is 314.94. That regulation talks about applications. But if you look at the definition of application, which we cite in our brief, it's in 313.3b, that definition defines an application to include amendments and supplements. In other words, to include subsequent actions by an ANDA manufacturer. And I think that tends to confirm that this obligation is a constant one. And while it is true, as Ms. Bierstein points out, that in 314.150, that provision does not speak specifically to the approved labeling. That provision simply provides that if labeling is, quote, no longer consistent with that for the listed drug, approval for the ANDA may be withdrawn. I don't think that that creates any problems for our argument here today, which simply rests on the fact that the regulations themselves, again, as interpreted by FDA, key off whether the labeling is the same as the approved label. In other words, with the label that has been approved previously by FDA. And for that reason, there's no reason for treating reference-listed drugs. What is the point of treating NDAs and ANDAs separately for purposes of the CBE process? Well, I think that... We've seen the... I've got to say, the briefing here is spectacularly technical. You all on both sides have done a terrific job of basically trying to teach us the language of the FDA. But in terms of the purposes of tort law and of the safety regulations for... that the federal government imposes on drugs, it's a little hard to keep larger purposes in sight. Sure, Judge. Give it a shot. I'll do my best. So I think that these regulations were promulgated initially in the immediate aftermath, or at least the more or less immediate aftermath of Hatch-Waxman. It actually took FDA eight years to promulgate final rules concerning the Hatch-Waxman process. That's sort of quick by Washington standards, I suppose. But those regulations, by their terms, have been construed, and again, by their actual terms, provide that only NDA manufacturers have the ability to kind of make full-fledged changes. Now, I think that the rationale for that is that NDA manufacturers are the ones who have conducted the full-fledged safety and effectiveness studies. And even prior to Hatch-Waxman, when the obligations for ANDA drug applications were somewhat different, I think it is fair to say that ANDA applicants did not engage in such a full-fledged analysis. And so even with regard to a drug like ours, Depo-T, I can say, based on the regulatory file, which was disclosed in full in discovery, that Pfizer's predecessor, Upjohn, conducted a somewhat more limited analysis. They conducted biological equivalence studies to establish that there was, in fact, biological equivalence with a drug that had previously been approved through the NDA process. Now, Judge Hamilton, I'm willing to acknowledge that there are weighty policy considerations that underlie all of this. And indeed, as you will be aware from the briefs, in 2013, FDA proposed a rule that would essentially open up the CVE process to all ANDA manufacturers and allow them to make unilateral changes. And I'm willing to concede that there might be policy arguments in support of doing that. Now, of course, FDA has not, in fact, promulgated such a final rule. But the critical point for purposes of this case is, well, there are really two critical points. The first is that the Supreme Court has made clear, and Ms. Bierstein agrees today, that the preemption analysis turns on the ability to invoke the CVE process to make unilateral changes. And second, relying in part on the 2013 proposed rule and what FDA said about the current state of affairs, FDA, again, made quite clear, both in the proposed rule and in the regulatory impact analysis, that ANDA manufacturers whose drugs are reference-listed drugs are no different from any other ANDA manufacturers in their inability to make unilateral changes. And at a minimum, even if you didn't agree that that was the better interpretation of the regulations, FDA's position on that issue would be entitled to deference. We know that from PLEVA v. Mensing itself, because the Supreme Court, in accepting the proposition that ANDA manufacturers more generally could not make unilateral changes, relied on deference to FDA's interpretation of its own regulations. Now, I want to say just a word about this issue of reference-listed drugs, because I think at least in her brief, Ms. Bierstein places a lot of weight on the notion that reference-listed drugs should be treated differently. I think it's very, very important to sort of think about what it means under this regulatory scheme to be a reference-listed drug. What it means is essentially that your labeling, and indeed in some respects your drug, is a benchmark. So if you take a look at the definition of a reference-listed drug, and this is in section 314.3b, a reference-listed drug means the listed drug identified by FDA as a drug product upon which an applicant relies in seeking approval of its ANDA, its abbreviated application. So there are two consequences to becoming the reference-listed drug. The first is that once FDA approves your labeling, that labeling is the benchmark, including the benchmark for any ANDAs that are dependent on your labeling. The second is that if a new ANDA manufacturer wants to come into the market, your drug is the standard for purposes of the bioequivalence analysis. There are no affirmative obligations on a reference-listed drug ANDA manufacturer. That manufacturer is subject to the same obligations with regard to pharmacovigilance, and that's just a silver dollar word for the notion that a generic drug manufacturer does have to monitor safety. If there are adverse events concerning their drug, they have to report them to FDA, and as FDA itself suggested in PLEVA versus mensing, an ANDA manufacturer retains the ability to ask FDA to make changes to its labeling. Our critical submission is that an RLD ANDA manufacturer stands in no different a place from any other ANDA manufacturer. It is subject to the same limitation on its ability to invoke the CBE process. As FDA has said, that interpretation is entitled to deference, and therefore there should be preemption. We would ask that the judgment of the district be affirmed.  Thank you, Mr. Shanmugam. Ms. Bierstein, how much time is left? Let's make it three. I hope I have a couple of minutes here. Your Honor, with all due respect to your question about the technicalities and the policies, I just want to note that this is a preemption case, and preemption is a demanding defense that requires Pfizer to establish by clear evidence that it was precluded by federal law regulations  So the policies aren't really the issue. The issue is the policies are what the Supreme Court set forth in Wyeth v. Levine. The obligation to change your label is not under federal law. It's under state law. The question is, is there some federal law that prevents them from doing that? And if federal law is ambiguous, I would suggest the defendants fail to meet their burden to show that during the 30-plus years that this drug was on the market before these claims were brought, that at no time were they ever able to make a change to their label. I would say as well that Mr. Shanmugam emphasizes that the ANDA manufacturers are under an ongoing obligation, and that's true, but this Court has to ask, obligation to do what? And the only regulation that relates to an ongoing obligation is 314.150. All the ones that deal with supplements just tell you that if you're submitting a supplement, yes, you have to comply with this regulation for the supplement, but if you're just sitting around with your drug during the years that it's been approved, there's no new application you're making, what is your ongoing application? I'm sorry, your ongoing obligation? The only regulation, so this is the only impediment to what state law is telling them to do. State law is saying, add a warning if you know about risks, and they want to say, we weren't allowed to. And you ask Mr. Shanmugam, what's your best, what's the biggest impediment? And I'm not sure I know what his answer was, but I think the answer has to be, certainly in Mensing, the answer is 314.150. It's 3.150, 3.314.150, that in PLEVO or Mensing, whichever we want to call it, that's what prevented the generic manufacturer in that case from doing it, because had they done it there, their label would not have been the same as that of the RLD. And so the insight of Mensing was you got an RLD over here, and you got an and a drug, which was not the, you got an and a drug over here, and if the and a makes a change, now the two labels are different, the RLD and the and a. And 314.150 is the only place where the FDA says, uh-uh, you can't make them different, because if you do, we're going to yank your drug. Now the FDA has many times spoken about this duty of sameness, and I just want to note they have never addressed this particular issue. So when they've, I'm sorry, my time is up. Go ahead and complete the thought, and I've got one other question. Okay. They have spoken about and-a holders, but never in this context. And if you look at what they've said, they've always talked about the need for the duty of sameness, but never addressed this specific issue. But isn't this context analogous to when an NDA is withdrawn? I don't think it is, Your Honor, because when the NDA is withdrawn, if no new RLD is in place, you have all these generics, and they're all bound to whatever the RLD is. If one of them makes a change, they're going to be different from each other. By maintaining the sameness, it is true that this is the same when the NDA is withdrawn and the FDA appoints a new RLD holder, but the FDA has never written an opinion or a regulation about what happens in that context. A couple more quick questions. Yeah. Would you agree that to reverse in this case, we would need to split with the Sixth Circuit's decision in Darvocet? I would, Your Honor. I think the Sixth Circuit decision in Darvocet is wrongly reasoned, and that's in the brief, and I'm not going to go back through it. But, yes, you would be at odds, although I do think the drug in Darvocet was a post-hatch waxman drug. So to the extent there's a difference, it is arguably distinguishable because this drug was never subject to even the regulations that govern the application process in Darvocet was. So to that extent, there's a distinction. Okay. We'll leave it at that, then. Thank you very much. Thanks to all counsel. The case is taken under advisement.